**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEF BAILEY,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　Defendant. | No. 2:17-CV-2360-JAM-DMC<br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pending before the court are the parties' brief on the merits (Docs. 16 and 26).

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

1

v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

For the reasons discussed below, the court recommends the matter be remanded for further proceedings.

## I. THE DISABILITY EVALUATION PROCESS

To achieve uniformity of decisions, the Commissioner employs a five-step sequential evaluation process to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f). The sequential evaluation proceeds as follows:

| | |
|---|---|
| Step 1 | Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied; |
| Step 2 | If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 3 | If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted; |
| Step 4 | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |

|   |   |   |
|---|---|---|
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A). The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989). The claimant has the initial burden of proving the existence of a disability. See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work. See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy. See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## II. THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on January 7, 2016. See CAR 21.[1] In the application, plaintiff claims disability began on July 26, 2014. See id. In his brief, plaintiff alleges disability due to "mental problems." Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on February 13, 2017, before Administrative Law Judge (ALJ) Curtis Renoe. In a May 5, 2017, decision, the ALJ concluded plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairment(s): affective disorder, organic mental disorder (Traumatic Brain Injury), anxiety disorder, bipolar II disorder, and post-traumatic stress disorder;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: full range of work at all exertional levels; claimant can perform simple routine, repetitive tasks; he can make simple work-related decisions; he can occasionally interact with supervisors or coworkers, but cannot engage in teamwork or joint work to accomplish assigned work or duties; he cannot interact with the public;

4. Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

See id. at 24-38.

After the Appeals Council declined review on September 11, 2017, this appeal followed.

///
///
///
///
///
///

---

[1] Citations are the to the Certified Administrative Record (CAR) lodged on April 3, 2018 (Doc. 11).

## III. DISCUSSION

In his opening brief, plaintiff argues: (1) the ALJ erred in failing to evaluate treating source medical opinions; (2) the ALJ failed to articulate sufficient reasons to reject the medical opinions of his treating therapist; (3) the ALJ erred in failing to evaluate plaintiff's symptom allegations; and (4) the ALJ erred in disregarding plaintiff's qualification for the Veterans Administration Caregiver Support program.

Prefacing his arguments, plaintiff states:

> Josef Bailey has mental problems. At his last job, working from home for Apple, which ended in 2014 because he was fired, he had accommodations including being allowed to take extra breaks to compose himself if a customer upset him (which apparently occurred 10 times a week) and bigger breaks that occurred about three times a week; these would probably lie outside the ambit of "substantial gainful activity." (Transc., pp.67–72, 73–75, 96–97; 20 C.F.R. §404.1573(c)(2)) That is, he was not "working" for about three years before he was fired.
> He also didn't pass basic training for the Army (transc., p.65) but five years later enlisted in the National Guard (transc., p.66), serving in Iraq and returning with PTSD. (*Id.*) He then worked for Apple for seven years, starting in 2007, (transc., p.72); his accommodations began in 2011 (transc., p.72); and his PTSD worsened in 2013. (Transc., p.67).
> PTSD was not his only mental problem. He had a history of special education, apparently for learning disability/memory/ADHD, and repeated the third grade. (E.g., transc., pp.77–78, 876, 944, 991).

At footnote four of his brief, plaintiff adds:

> He was also a crack baby, was raised in foster care, and may have been sexually abused. His foster parents terminated their relationship with him and his twin brother when the twins were age 14, and Mr. Bailey then had to live in a group home to age 18. (Transc., pp.649, 876).

Plaintiff continues:

> . . .Apparently his problems became acute in 2013, before his firing from his Apple job in 2014. He presented to a Veterans Administration traumatic brain injury clinic in April 2013 shortly after breaking his wife's collarbone and suffering legal consequences. (Transc., p.943). He was dependent on his wife for daily functioning (footnoted omitted); she described him as overwhelmed by his job and unable to help their children with simple math and reading. (Transc., p.944) In September 2013 he received a neuropsychological evaluation through the VA. He had called the suicide hotline six days earlier. Mr. Bailey reported a history of blast exposure in Iraq that could have caused cognitive damage. Testing showed sustained visual and auditory attention was extremely impaired and performance on a number of memory protocols was impaired. (Transc., p.878).

5

His problems were not just cognitive, as hinted already. He had called the suicide hotline six days before his neuropsychological workup revealing marked and extreme memory and attention problems, respectively. That was September 2013. In January 2014 and May 2014, he again called the VA National Suicide Prevention Hotline. (Transc., pp.831, 835). In February 2015, his wife brought him into the VA because of active suicidal ideation; he was assessed at moderate risk and reported hearing voices for the first time; and he was prescribed daily medication and psychologist and psychiatrist interventions. (Transc., pp.832–826) In July 2014 he was fired from his job. In October (transc., p.798) and December 2014 (transc., p.775 he called the suicide hotline; his global assessment of functioning was put at 48 in November (transc., p.787) and December. (Transc., p.764) In February 2015 he was mentally hospitalized for suicidality, flashbacks of Iraq, and auditory hallucinations. (Transc., p.649) In July 2015 he called the crisis line again, this time with homicidal ideation directed toward his wife and children. (Transc., pp.554–555) Later that month he overdosed on medication he took from his wife's purse while she was driving on the freeway and was hospitalized at Methodist Hospital. (Transc., p.553) In November 2015, Mr. Bailey's principal psychotherapist, Victoria Steen, LCSW, recommended removing his high-risk safety flag because of recent stability (transc., p.477), but in early February 2016 he was hospitalized for suicidality (e.g., transc., p.440) and his high suicide risk flag returned. (Transc., p.441).

During this claim, Mr. Bailey received a 100 percent VA disability rating. (Transc., p.1090).

**A.    Medical Opinions**

1. <u>The ALJ's Analysis</u>

At Step 4, the ALJ evaluated the medical opinions to determine plaintiff's residual functional capacity. <u>See</u> CAR 29-36. After discussing the various medical findings and opinions, <u>see id.</u> at 29-34, the ALJ gave weight to each opinion, <u>see id.</u> at 34-36. The ALJ gave "great weight" to the opinions of the reviewing physicians, Drs. Schnitzler and Davis. <u>See id.</u> at 35. The ALJ also noted the Veterans' Administration (VA) rated plaintiff 100% disabled during the relevant time period, but gave the VA rating "little weight." <u>Id.</u> at 35-36.

With respect to plaintiff's treating therapist, Ms. Steen, the ALJ stated:

. . .VA records indicate as a result of his initial reports [of PTSD], [plaintiff] underwent a mental health intake examination by social worker, Victoria Steen, LCSW [License Clinical Social Worker]. Records reveal a history of diagnosis of PTSD and ADHD. He reported a history of exposure to multiple blasts while in the military and rule out traumatic brain injury was diagnosed. On mental status exam, Ms. Steen noted he was "casually dressed, some body odor," he was cooperative, his mood was euthymic with a slightly blunted affect. He denied suicidal and homicidal ideation. His thought process was slightly circumstantial. He

endorsed no psychotic thought content.  He reported a history of special education classes as a child.  Ms. Steen found his judgment and insight fair (4F/613).  His initial global assessment of functioning was assessed at 40 indicating he presented with "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)" as defined by the American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text rev.).  Washington, DC Author:  He was referred to counseling, medication management, and various PTSD-related and group therapy (4F/619-624, 618, 608-616).  An initial screen was positive for TBI [Traumatic Brain Injury] and thus he was referred for additional evaluation (4F/618).

* * *

On August 20, 2014, Victoria Steen, his mental health case manager, called him and he admitted missing appointments due to transportation issues as he was separated from his wife.  He also admitted that he was not taking his medication.  Records indicate he was discharged form [sic] TBI/Polytrauma team on July 16, 2014, for lack of recent referrals for rehabilitation services.  Ms. Steen rescheduled a medication management appointment for the claimant (4F/324-424).

* * *

On. . .January 5, 2016, Victoria Steen, LCSW, wrote a note on behalf of the claimant stated he was receiving multiple services at Mather VAMC, was diagnosed with PTSD and TBI and has been unable to hold successful employment since July 2014.  She opined, "Veteran remains severely symptomatic and it is not recommended he return to work at this time." (4F/80).

* * *

Victoria Steen, the claimant's licensed clinical social worker, prepared a letter dated January 5, 2016, opining that due to PTSD and TBI the claimant "remains severely symptomatic and it is not recommended that he return to work at this time" (4F/80).  While the claimant has a long history of case management with Ms. Steen, who is very familiar with his conditions, her opinion is not consistent with treating notes a few months earlier in November 2015 indicating he was stable psychiatrically and his risk status was removed from his file.  It appears, the claimant walked in and related financial difficulties and a desire to continue treatment and this was the catalyst for her letter.  Evidence prior to the letter and after indicate[s] the claimant is stable when he is compliant with medications and that his symptoms escalate when he self-adjusts or discontinues medication.  Accordingly, the undersigned finds Ms. Steen's opinion inconsistent with substantial evidence and assigns it little weight.

CAR 28-29, 31, 33-35.

///

///

7

2. Plaintiff's Contentions

In section IV.A. of his brief, plaintiff asserts the ALJ failed to evaluate "supportive treating physician opinion." In section IV.D. of his brief, plaintiff also argues the ALJ failed to provide sufficient reasons for rejecting opinions expressed by his treating therapist, Ms. Steen. Notably, plaintiff does not challenge the ALJ's analysis as to the VA's disability rating.

As to the "supportive treating physician opinion" evidence, plaintiff argues:

> At page 34 of the transcript the decision states:
>
> > On April 26, 2016, the claimant' internal medicine physician prepared a document to excuse the claimant from participating in California's CalWorks program, a requirement for receipt of state benefits. The physician opined he [meaning Josef Bailey, not the internist] had poor comprehension and memory to complete everyday tasks. His ability to adapt to work or work like situations was poor due to his underlying mental health disorder.
>
> The document is at pages 1007–08 of the transcript. It does indeed so state. The regulations *require* that every medical opinion be evaluated. (20 C.F.R. §404.1527(b) and (c)) ["In determining whether you are disabled, we will *always* consider the medical opinions in your case record"; "Regardless of its source, we will evaluate *every* medical opinion we receive"] (emphases added)).
> This opinion that Mr. Bailey's comprehension and memory were insufficient for everyday tasks and that his ability to adapt to work or work-like situations is poor corresponds perfectly with the neuropsychological testing finding marked and extreme memory and attention problems, respectively, with the reasons for Mr. Bailey's substantial job accommodations that rendered that job not "work" under the Act and with the reasons he lost that job (transc., pp.69–70, 805), with his recurrent suicidality and hospitalizations, with his step-two impairments — affective disorder, organic mental disorder (Traumatic Brain Injury), anxiety disorder, bipolar II disorder, and posttraumatic stress disorder — with his need for caregivers (his wife or his aunt; see below), and with his "serious" GAFs of 48.
> This opinion that Mr. Bailey's comprehension and memory were insufficient for everyday tasks and that his ability to adapt to work or work-like situations was poor would render him disabled. (Social Security Ruling 85–15: The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to . . . respond appropriately to . . . usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability . . . .
> The decision never evaluates this disabling medical opinion that amply accords with the evidence and if accepted compels disability. This opinion comes from a treating source. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of

8

doctors who do not treat the claimant. (*Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995) citing *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1987)) Even if contradicted by another opinion, treating physician opinion can only be rejected by "providing 'specific and legitimate reasons' supported by substantial evidence in the record for doing so." (*Lester, id.*; citing *Murray v. Heckler,* 722 F.2d 499, 502 (9th Cir. 1983)).

*A fortiori,* disabling treating physician opinion backed by objective neuropsychological testing, hundreds of pages of treating records including hospitalizations and suicide hotline calls, Mr. Bailey's work history, his personal history, his and his wife's testimony, and also the opinion of his psychotherapist Victoria Steen (see below) cannot be *ignored.* This cannot very well be harmless error. (See *Stout v. Commissioner, Soc. Sec. Admin.,* 454 F.3d 1050, 1056 (9th Cir. 2006) [failure to discuss third-party testimony favorable to a claimant can't be harmless error unless reviewing court can confidently conclude that no reasonable ALJ, fully crediting testimony, could have reached different disability determination]).

The decision should be reversed because it failed to evaluate this supportive treating physician opinion.

Regarding his therapist, Ms. Steen, plaintiff contends:

The decision failed to evaluate a supportive treating physician statement addressing capacities relevant to both the listings and mental residual functional capacity (argument A), it ignored Mr. Bailey's symptom allegations (argument B), it ignored his "caretaken" status containing direct implications for the listings and MRFC (argument C), but it devoted more verbiage to deprecating a three-sentence statement from Mr. Bailey's treating therapist, Victoria Steen than the statement itself. (Transc., pp.34–35, 458).

Ms. Steen's rather general statements that Mr. Bailey "remains severely symptomatic" and that "it is not recommended he return to work at this time" (transc., p.458) deserved more than the "little weight" (transc., p.35) the decision gave them.

The decision admits Ms. Steen's "long history" with Mr. Bailey and that she "is very familiar with his conditions." (Transc., p.34) The mere fact Mr. Bailey was sufficiently "stable," to use the decision's word, that his suicide risk flag was removed two months before her statement simply does not impeach Ms. Steen's statement, which does not contend Mr. Bailey's (frequent, recurrent) suicidality was its basis, and moreover the following month Mr. Bailey was mentally hospitalized for suicidality, flashbacks of Iraq, and auditory hallucinations. (Transc., p.649) Thus, "stability," an isolatable second decisional reason for discounting Ms. Steen's statement (transc., p.34), is not only not logically and semantically equivalent to "nondisabled" but in Mr. Bailey's case is fleeting, transitory, and doesn't last long enough for *sustained* work-capacity "on a regular and continuing basis."(footnote omitted). Also, the fact that Mr. Bailey (and his caregiver wife) walked into the clinic and explained that Mr. Bailey's state disability was running out the day Ms. Steen issued this statement (compare transc., pp.34 and 458) doesn't detract from the validity of Ms. Steen's statement; indeed, the very sentence after the Ms. Steen sentence saying SDI was running out, from which the decision derives its information that this was the "catalyst" (transc., p.34) for Ms. Steen's support, reflects Ms. Steen writing "Writer does not believe veteran able to return to work at this time (combination of personality

9

disorder traits, inability to provide for his own self-care, impulsivity, mood sx). Writer isn't sure if LCSW letter will be accepted; however, was willing to write it on veteran's behalf." (Transc., p.458) The decision fails to marshal sufficient evidence to overcome this *stated* sincerity with its mere *implication* that Ms. Steen's statement was provided insincerely.

      The decision insists, not just in demeaning Ms. Steen but throughout, that "the claimant is stable when he is compliant with medications and that his symptoms escalate when he self-adjusts or discontinues medication." (Transc., pp.34–35) The logical/semantic fallacy of equating "stability" with "nondisability," and the need for sustained, regular, and continuing mental capacity to perform work were addressed in the previous paragraph including footnote 8. Since this entire decision is besotted with the problematic concept embodied in this quote about Mr. Bailey's recurrent noncompliance, it will be discussed separately here. The decision's repeated reliance on this is contrary to case law. For instance, *Winter v. Berryhill,* No. 15–17095 (9th Cir. 9/25/17) reads "that Winter was apparently non-compliant with her prescribed treatment regimen at certain times does not convincingly undermine Winter's claimed level of disability, as noncompliance with treatment by individuals with bipolar disorder is consistent with their diagnosis," citing *Brewes v. Commissioner of Soc. Sec. Admin.,* 682 F.3d 1157, 1164 (9th Cir. 2012)9 [our decision found at step two that Mr. Bailey had bipolar disorder], and pointing out that Winter consistently sought treatment, as did Mr. Bailey. *Garrison v. Colvin,* 759 F.3d 995, 1017–18 (9th Cir. 2014) goes on at some length on this head, beginning, "The ALJ added that some of Garrison's mental impairments were caused by Garrison going off her medication. These are not clear, convincing, and specific grounds for rejecting Garrison's testimony . . . ." (*Id.* at 1017) *Garrison* takes one through the waxing and waning nature of psychiatric impairments, citing *Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001); the need to interpret "improvement" (or "stability") in context (including in Mr. Bailey's case the context of his "caretaken" status), citing *Ryan v. Commissioner of Soc. Sec.,* 528 F.3d 1194, 1200–01 (9th Cir. 2008) and *Hutsell v. Massanari,* 259 F.3d 707, 711, 712 (8th Cir. 2001); and the specific, repeated, and central error of this decision: The ALJ also erred in concluding that Garrison must be discredited on the ground that some — though not all — of her bouts of remission [sic] appear to have resulted from Garrison going off some of her medications. As we have remarked, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." [citing *Nguyen v. Chater,* 100 F.3d 1462, 1465 (9th Cir. 1996)] In other words, we do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions. *See, e.g., Martinez v. Astrue,* 630 F.3d 693, 697 (7th Cir. 2011); *Spiva v. Astrue,* 628 F.3d 346, 351 (7th Cir. 2010); *Pate-Fires v. Astrue,* 564 F.3d 935, 945 (8th Cir. 2009). Here, the record shows that Garrison's occasional decisions to go "off her meds" were at least in part a result of her underlying bipolar disorder and her other psychiatric issues. *(Garrison* at 1018fn.24).

      What are really two statements by the admittedly knowledgeable treating therapist Steen on page 458 of the transcript (her statement and her chart about making it and why she agreed to make it) were wrongly rejected.

### 3. Applicable Legal Standards

"The ALJ must consider all medical opinion evidence." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)). The ALJ errs by not explicitly rejecting a medical opinion. See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014). The ALJ also errs by failing to set forth sufficient reasons for crediting one medical opinion over another. See id.

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources. 20 C.F.R. § 404.1513(a); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012). Where the acceptable medical source opinion is based on an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it rests on his own independent examination of the claimant." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The opinions of non-examining professionals may also constitute substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record. See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). Social workers are not considered an acceptable medical source. See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010). Nurse practitioners and physician assistants also are not acceptable medical sources. See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016). Opinions from "other sources" such as nurse practitioners, physician assistants, and social workers may be discounted provided the ALJ provides reasons germane to each source for doing so. See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance when opinions from "other sources" may be considered acceptable medical opinions).

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the

opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

/ / /
/ / /
/ / /
/ / /
/ / /

4.      Disposition

As to "supportive treating physician opinion," plaintiff argues the ALJ did not evaluate opinions rendered by his treating internal medicine physician on April 26, 2016, that plaintiff had poor comprehension and memory and poor ability to adapt in the workplace. Plaintiff also argues the ALJ failed to properly evaluate opinions rendered by Ms. Steen, his treating therapist. Plaintiff does not raise any arguments with respect to any other treating source opinions.

Regarding the April 2016, assessment, plaintiff notes the record at CAR 1007-1008, which consists of a two-page "Authorization to Release Medical Information" form dated April 8, 2016 – not April 26, 2016 – completed by a VA "provider/evaluator." CAR 1007-1008. The form indicates plaintiff's ability to complete tasks is affected due to "poor comprehension & memory" and plaintiff's ability to adapt to work or work-like situations is "poor due to underlying mental health disorder." Id. at 1008. The court agrees with plaintiff the ALJ erred by ignoring these opinions, which suggest limitations inconsistent with the ALJ's residual functional capacity finding. See Tommasetti, 533 F.3d at 1041; Garrison, 759 F.3d at 1012. While defendant suggests a number of reasons the ALJ might have provided for rejecting these opinions, the court declines defendant's invitation to substitute its judgment for the Commissioner's. The matter should be remanded to allow the Commissioner to determine in the first instance the appropriate weight to be given the April 2016 opinions of the VA provider.

Ms. Steen opined in January 2016 plaintiff is "severely symptomatic" and she did not recommend he return to work. The ALJ gave this opinion little weight, finding it unsupported by clinical observations. See CAR 34-35. Plaintiff argues the ALJ's analysis as to Ms. Steen is flawed because it misstates the treatment notes. The court does not agree. As the ALJ noted, progress notes from November 2015 indicate plaintiff had been psychiatrically stable for the prior three months, had been compliant with medication, and plaintiff reported "things at home are currently going very well." Id. at 475 (Exhibit 4F). This evidence supports the ALJ's rationale because it is inconsistent with Ms. Steen's report plaintiff remained "severely symptomatic" in January 2016.

**B.    Credibility**

    1.    The ALJ's Analysis

At Step 4, the ALJ provided a detailed evaluation of the credibility of plaintiff's statements and testimony to determine his residual functional capacity. See CAR 26-34. The ALJ stated:

> The claimant testified he was in the military from 1999 to 2000 and from 2005 to 2009. He had a break in service because he did not pass basic training and was honorably discharged. He reenlisted in the National Guard and served from 2005 to 2009 during which time he was deployed from 2006 to 2007. He testified he suffers mental problems from his service in Iraq and had an episode in which he blacked out. He alleges no physical problems associated with his military service.
>
> The claimant last worked in technical support via phone for Apple products including iPhone and iPads in 2014. While working at Apple, he was provided accommodations for his mental conditions stemming from military work. For example, if he received a customer call during which he felt there was a threat, he could take a five to ten minute break to compose himself and he also had an accommodation to take an extra half hour three to four times per week. He could also instant message his manager who could assess his situation. He estimated that during the seven years he worked for Apple, he had such instances beginning in 2011.
>
> He has a learning disorder for which he was provided special education. He was able to perform his job at Apple because he had a script or decision tree from which he worked including sticky notes and the job became routine. Anything off his routine required he consult with someone. His anger prevents him from working. He testified he wants to choke people. He does not know what people are thinking about him. Prior to knowing he had PTSD, he had an episode in which he became angry and broke his wife's collarbone, spent a week in jail, and is on probation.
>
> The claimant is married with five children ages 15, 13, 11, 6, and 3 with whom he lives. The claimant does limited household chores. His wife makes meals because he is a terrible cook. He is too scared to cook and feel overwhelmed. He drives his children to school daily. He can help his younger child with some basic homework but not his older children due to his learning disorder. He requires reminder to do personal grooming. He tries to help around the house and can do dishes, mop, sweep, vacuum. His wife and children care for two dogs. He goes with his wife monthly to shop for groceries and helps her carry the groceries. He has anger issues with certain race of people that make him nervous including Iraqi men, Middle Eastern men, and with turbans trigger his PTSD. He looks at people as targets or enemies and has difficulty with people who are authoritative. When he feels triggered, he has difficulty concentrating and paying attention. He tends to ruminate about his time in the military and

///

becomes sidetracked frequently in a week and spends time checking Facebook to check on people.

CAR 27.

The ALJ found plaintiff's statements and testimony not fully credible, concluding they are ". . .not entirely consistent with the medical evidence and other evidence. . ." Id. at 28. The ALJ then extensively described plaintiff's treatment records. See id. at 28-34. After discussing the opinion evidence, see id. at 35-36, the ALJ stated:

> In sum, the above residual functional capacity assessment is supported by treatment evidence the claimant has psychiatric stability while compliant with medications. Regarding TBI [Traumatic Brain Injury], the records show his treating sources found it was mild and had difficulty determining the effect of TBI versus symptoms from his mental conditions. While he claims he has memory and concentration issues such that he cannot retain information adequately to work, and that he had difficulty attending group sessions for this reason, group session records reveal otherwise. On March 21, 2015, he reported significant improvement on medications with some fatigue. Records show he continued participation in therapy and group counseling classes. Reported some confusion with class concepts but continued to attend and group counseling notes no difficulties with material (4F/229, 224, 217, 212-213, 211). Polytrauma rehabilitation notes show treatment was adjusted to account for simplification of materials and work accommodations were formulated to address stress associated with customer service calls. He worked for several years prior to implementation of these accommodations. The undersigned finds the evidence and medical opinion support the claimant can perform simple routine tasks but that he could not work with the public.

Id. at 36.

2. Plaintiff's Contentions

Plaintiff argues:

> At page 27 of the transcript the decision adduces a number of Mr. Bailey's symptom allegations, and at page 28 one encounters the standard FIT-template boilerplate bringing those allegations past the first step and foundering them at the second step of the two-step claimant symptom evaluation required by 20 C.F.R. §404.1529, Social Security Ruling 16–3p, and the case law and considerations set forth at length in Smolen v. Chater, 80 F.3d 1273, 1281–84(9th Cir. 1996).
> There, however, things end. The decision not only fails to evaluate the multiple specified factors to be evaluated at that second step but fails altogether to return to its needed chore of justifying rejection of Mr. Bailey's symptom allegations at that second step.

/ / /

/ / /

3. <u>Applicable Legal Standards</u>

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See <u>Rashad v. Sullivan</u>, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See <u>id.</u> Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See <u>id.</u>; see also <u>Carmickle v. Commissioner</u>, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing <u>Lingenfelter v Astrue</u>, 504 F.3d 1028, 1936 (9th Cir. 2007), and <u>Gregor v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in <u>Smolen v. Chater</u>:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the <u>Cotton</u> test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See <u>Bunnell</u>, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen, 80 F.3d at 1284 (citations omitted). It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made. See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

        4.    Disposition

According to plaintiff, the ALJ's credibility analysis is deficient because it consists of boilerplate language after which ". . .things end." This argument, however, completely ignores the detailed analysis provided by the ALJ, outlined above. See CAR 26-36. Because the ALJ provided an analysis, the court finds the ALJ met his legal burden, see Rashad, 903 F.2d at 1231, and rejects plaintiff's argument the ALJ's hearing decision ". . .fails altogether to return to its needed chore of justifying rejection of Mr. Bailey's symptom allegations at that second step."[2]

**C.    VA Caregiver Program**

According to plaintiff:

> The decision not only ignored the disabling opinion of Mr. Bailey's treating physician and failed to evaluate his own testimony, it ignored Mr. Bailey's status as a recipient of Veterans Administration caregiver services, something carrying strong implications of disability including directly bearing on the "B" and "C" criteria of the mental listings. That Mr. Bailey's wife and sometimes his aunt were his caregivers has been mentioned, and references to his wife as caregiver are scattered throughout this record consisting mainly of VA medical records.
> Statutory authority for the VA caregiver program is 38 U.S.C. §1720G. Subsections (a)(2)(B) and (C) state veterans qualify because of "serious injury (including traumatic brain injury, psychological trauma, or other mental disorder) incurred or aggravated" by service on or after September 11, 2001, making them "in need of personal care services because of — (i) an inability to perform one or more activities of daily living; (ii) a need for supervision or protection based on symptoms or residuals of neurological or other impairment or injury; or (iii) such other matters as the Secretary considers appropriate." Regulatory elaboration is

---

[2] Plaintiff raises no arguments regarding the ALJ's rationale, in particular the ALJ's finding plaintiff's statements and testimony are inconsistent with the medical opinion evidence as well as the treatment records.

17

at 38 C.F.R. §§71.10ff. Section 71.15 defines inability to perform an activity of daily living and need for supervision or protection. Section 71.20 elaborates "serious injury" and "need for personal care services." Aside from direct correlations to Social Security about to be mentioned, acceptance in the program implies considerable severity:

> Current eligibility criteria requirements for acceptance into the caregiver program are rigorous. This is shown in the fact that there are currently only 22,000 participants in the program, which is less than three percent of the 1.06 million Global War on Terror veterans who have received a service-connected disability rating from VA as of September 30, 2016. Additionally, 86 percent of veterans who are enrolled in the caregiver program have a service-connected disability rating of 70 percent or higher. (footnote omitted).

The "in need of personal care" and "activities of daily living" criteria correlate closely with the "B" criterion of adapting or managing oneself and implicate the criterion of understanding, remembering, and applying information. Qualification and need for a caregiver correlates with the "C" criteria of needing psychoscocial support or a highly structured setting and with minimal capacity to adapt to changes in environment or demands not already part of your daily life. (See generally listing 12.00F and G.).

The record reflects Mr. Bailey and his wife being "educated to" the VA Caregiver Support program in April 2014, after Mr. Bailey broke his wife's collarbone and before he was fired from his non-SGA job with Apple that July. (Transc., p.943) It's clear that by the end of 2014 his wife was formally his caregiver. (Transc., p.772 ["Veteran is . . . engaged in the CGS Program. . . . message left for caregiver Susie Bailey"] The alleged disability onset date here is the July 2014 date of his termination from Apple. (E.g., transc., p.214) Footnote 5 above already mentions Mr. Bailey still being in the caregiver program in early 2017, months before the decision date. Thus, Mr. Bailey was in this program essentially throughout this claim.

The correlations between qualification for this caregiver program and the "B" and "C" criteria of the mental listings have just been mentioned. The correlations between qualification for this caregiver program and the supportive treating physician opinion this decision failed even to evaluate were mentioned in argument A. The correlation between deficits in activities in daily living and need for personal care and the basic work-related mental functions of understanding, remembering, and carrying out simple tasks and responding appropriately to usual work situations (see SSR 85–15) are rather obvious and should follow sufficiently from the foregoing not to need elaboration.

Just as *McCartey v. Massanari,* 298 F.3d 1072 (9th Cir. 2002) held, consistently with "all of the other circuits that have considered the question" (*id.* at 1076) that a VA disability rating must be given weight, so too must qualification for the VA Caregiver Program be given either "substantial" or "great" weight. (*Id.*; 20 C.F.R. §404.1545(a)(3)7 ["We will assess your residual functional capacity based on *all* of the relevant medical and other evidence." (Emphasis added)]; cf. 20 C.F.R. §404.1504, an older version of which is cited in *McCartey, id.,* which held an "ALJ must consider" a VA rating but "a VA rating of disability does not necessarily compel the SSA to reach an identical result.") *McCartey's*

| | policy considerations apply: "the marked similarity between these two federal disability programs," "Both programs serve the same governmental purpose," "Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims." (*Id.*). |
|---|---|
| | Even if much of the foregoing argument and authorities were rejected, the essential components that (1) Mr. Bailey's eligibility for the VA Caregiver program correlates closely with eligibility for Social Security disability and (2) that 20 C.F.R. §404.1545(a)(3) — and listing 12.00 (see fn.7) — require *all* relevant evidence be considered remain to require the decision to consider this fact. |
| | The decision's total disregard of Mr. Bailey's "caretaken" status warrants reversal on substantial evidence grounds (cf. Standard of Review, *supra*), as well as for the particularized reasons given here. |

Defendant does not dispute the ALJ was aware of plaintiff's participation in the VA Caregiver Support program during the relevant time period. While the ALJ discussed the VA's disability ratings, see CAR 35-36, the ALJ made no mention of plaintiff's participation in this program. In opposition, defendant once again invites the court to speculate as to a reason the ALJ might have provided for discounting this evidence:

> Next, in his arguments, Plaintiff omits discussion of subparagraph (iv) of 38 U.S.C. § 1720G(a)(2)(C) referring to the need of personal care services because of "such other matters as the Secretary considers appropriate." 38 U.S.C. § 1720G(a)(2)(C)(iv). This implies that the VA could have found that Plaintiff had not necessarily proven "an inability to perform one or more activities of daily living," in any case. In sum, Plaintiff fails to prove how having a VA caregiver should translate to being disabled under SSA's rules. *See* 20 C.F.R. § 404.1504. In any event, Plaintiff fails to provide evidence of an improper rejection by the ALJ of a VA action or determination. *See Turner*, 613 F.3d at 1225; *McCartey*, 298 F.3d at 1076.

Though it is possible the regulations cited by defendant suggest plaintiff may have been admitted to the VA Caregiver Support program for some unknown reason unrelated to disability, the court declines the invitation to substitute its own judgment for the Commissioner's in this regard. Plaintiff's argument is well-taken and the court rejects defendant's contention plaintiff ". . .fails to prove how having a VA caregiver should translate to being disabled under SSA's rules." To the contrary, as plaintiff notes and defendant does not dispute, the requirements of the VA Caregiver Support program are closely related to various findings required for a finding of disability under the Social Security Act. The court concludes the ALJ erred by failing to discuss plaintiff's participation in the VA Caregiver Support program.

# IV. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1. Plaintiff's motion for summary judgment (Doc. 16) be granted;

2. Defendant's cross-motion for summary judgment (Doc. 26) be denied; and

3. The Commissioner's final decision be reversed and this matter be remanded for further proceedings consistent with these findings and recommendations.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 16, 2019

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE